**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**May 25, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP876**

**STATE OF WISCONSIN**

Cir. Ct. No. 2018CV219

**IN COURT OF APPEALS**
**DISTRICT III**

KELLY BRELLENTHIN AND JOSEPH BRELLENTHIN,

    PLAINTIFFS-APPELLANTS,

  V.

DR. GREGORY GOBLIRSCH, WESTERN WISCONSIN MEDICAL ASSOCIATES, S.C. D/B/A VIBRANT HEALTH FAMILY CLINICS, ALLINA HEALTH SERVICES AND MMIC GROUP,

    DEFENDANTS-RESPONDENTS,

BLUECROSS BLUESHIELD OF MINNESOTA,

    SUBROGATED-PARTY.

      APPEAL from a judgment of the circuit court for Pierce County: THOMAS W. CLARK, Judge. *Affirmed*.

      Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  Kelly and Joseph Brellenthin appeal a summary judgment granted in favor of Dr. Gregory Goblirsch, Western Wisconsin Medical Associates, S.C. d/b/a Vibrant Health Family Clinics, Allina Health Services, and MMIC Group (collectively "Goblirsch"), dismissing their complaint alleging medical negligence in Goblirsch's treatment of Kelly.  The Brellenthins argue that the medical records filed in support of Goblirsch's motion were insufficient to support a prima facie case for summary judgment on statute of limitations grounds.  Additionally, the Brellenthins contend that expert testimony was required to support Goblirsch's prima facia case for dismissal.  We reject the Brellenthins' arguments and conclude that the medical records submitted in support of Goblirsch's summary judgment motion were sufficient to present a prima facie case for summary judgment of dismissal, which the Brellenthins did not sufficiently rebut.  We therefore affirm.

## BACKGROUND

¶2     Kelly Brellenthin contacted Goblirsch's office on March 3, 2015, because she had developed a significant allergic reaction, which she attributed to food she had eaten.  On that same day, Goblirsch prescribed Benadryl and instructed her to follow up with him if her symptoms worsened.  The following day, Kelly contacted Goblirsch complaining that her symptoms had worsened and asked about being prescribed prednisone, a corticosteroid, which she had used in the past.  After Goblirsch reviewed her symptoms, he prescribed 20 mg per day of prednisone for Kelly to use orally for seven days.

¶3 Over the next several days, Kelly's symptoms continued to worsen, prompting her to go to the emergency department at River Falls Hospital. On March 11, 2015, she was transferred to Allina's Health United Hospital in Minnesota, where she remained until March 16, 2015. At the time of her discharge from United Hospital, Kelly was placed on a prednisone regimen designed to taper her prednisone use. This taper included taking 60 mg twice a day for three days (March 17-19, 2015); 60 mg once a day for three days (March 20-22, 2015); 40 mg once a day for three days (March 23-25, 2015); then 20 mg once a day for three days (March 26-28, 2015).

¶4 Following Kelly's discharge from United Hospital, she followed up with Goblirsch on March 18, 2015. Goblirsch continued Kelly on her medication regimen prescribed at United Hospital, including prednisone. On March 23, 2015, Kelly contacted Goblirsch reporting that her symptoms were returning and not under control with her current 40 mg per day dose of prednisone. After Goblirsch recommended returning Kelly to her previous dosage of 60 mg per day, she requested more steroids. In response, Goblirsch agreed to try an increased prescription of 80 mg per day of prednisone.

¶5 Kelly continued to experience discomfort, so she saw several other physicians, including an allergist in early April 2015 at Mayo Clinic, and she was admitted to the Mayo Clinic for observation and management. While hospitalized at Mayo Clinic, her providers made a slight modification to her existing medication regimen and initiated another tapering of the prednisone by decreasing the dosage to 50 mg per day and then weaning by 10 mg every day for five days. Kelly was discharged from Mayo Clinic on April 9, 2015.

¶6     On May 11, 2015, Kelly contacted Goblirsch reporting that she had completed the prednisone taper but had been "sicker than a dog," and she wondered if she was experiencing withdrawal. At that time, Goblirsch agreed to extend the taper, approving an additional 5 mg per day for five days and decreasing to 2.5 mg per day for five days thereafter with no refills, and instructions to follow up if no improvement.

¶7     On June 3, 2015, Kelly saw Goblirsch for follow up. She described experiencing myopathy and arthralgia, weakness, fatigue, nausea, vomiting and constipation. At that time, Goblirsch made clear he was not in favor of resuming prednisone for Kelly and advised her to follow up with her Mayo Clinic physicians. This was the last time Goblirsch saw Kelly as a patient, as she later transferred her care to Mayo Clinic. In the following months, a number of Mayo Clinic physicians documented Kelly's complaints and attributed them to her corticosteroid use.

¶8     On June 12, 2015, Kelly saw a Mayo Clinic rheumatologist, who noted that during his first meeting with her on April 3, 2015, "[her difficulty breathing] was thought to be steroid-induced abdominal fluid retention which altered her respiratory mechanics. … She was diagnosed with iatrogenic Cushing's as a result of the high-dose steroids." Kelly's Mayo Clinic rheumatologist ordered a cosyntropin stimulation test because of a "concern for secondary adrenal insufficiency" related to her high-dose corticosteroid use. On July 1, 2015, this test was reviewed by a Mayo Clinic endocrinologist, who noted that there was a "suboptimal response of the adrenal gland to [the cosyntropin test]. The most likely cause is chronic exogenous high-dose steroids, which have led to secondary adrenal insufficiency …."

4

¶9    On July 8, 2015, Kelly saw a Mayo Clinic neurologist, who noted:

> [Kelly] has been referred … for a neurologic consultation principally to address her headaches which arose in March/April 2015.  These arose in the context of high dose corticosteroid therapy for about three weeks in March ….  She did develop iatrogenic Cushing's syndrome as a result of the prednisone treatment for urticaria.

During a consultation on July 21, 2015, a psychiatrist noted that Kelly was experiencing "[a]drenal insufficiency secondary to exogenous steroid treatment" and "[h]eadache and vestibular symptoms associated with steroid treatment withdrawal" (emphasis omitted).

¶10    On September 15, 2015, Kelly returned to see a Mayo Clinic doctor for a psychiatry consult and reported that she had continued headaches on a "daily basis" and that she "has had hours free of headache but no day without at least some cephalalgia."  A day later, Kelly wrote to one of her Mayo Clinic doctors about pain she was experiencing in her hands, noting that "[i]t feels like the symptoms I have in my hands from the steroid poisoning are now in my feet and toes.  I also have a great amount of pain, grinding and popping in my knees."

¶11    On October 6, 2015, Kelly underwent a vestibular evaluation at Mayo Clinic for what was described as "daily unsteadiness, waxing and waning head pressure, and brief spontaneous episodes of vertigo following an adverse response to steroid treatments initiated in April of 2015."  On October 26, 2105, Kelly visited the Mayo Musculoskeletal Clinic, where she described knee pain that "ha[d] been bothering her for a couple of months."  Her physician ordered an MRI, and on October 28, 2015, the imaging showed that Kelly had "[a]vascular necrosis of the femoral heads, left greater [than] the right, without evidence of articular surface collapse at this time."

5

¶12    On November 2, 2018, the Brellenthins commenced this lawsuit against Goblirsch, alleging that Goblirsch negligently prescribed Kelly high doses of corticosteroids causing bilateral avascular necrosis of her hips and vestibular migraine headaches.  Goblirsch moved for summary judgment, arguing the Brellenthins had failed to file suit within the three-year time limit set forth in WIS. STAT. § 893.55(1m) (2019-20).[1]    In support of the motion, Goblirsch acknowledged that he had treated Kelly with corticosteroids until June 3, 2015. Goblirsch also filed an affidavit attaching certified copies of Kelly's medical records, which showed that her health care providers had documented her adverse reactions to the corticosteroids more than three years before the suit.

¶13    The court applied WIS. STAT. § 893.55(1m) and the holdings in *Estate of Genrich v. OHIC Insurance Co.*, 2009 WI 67, ¶17, 318 Wis. 2d 553, 769 N.W.2d 481, and *Doe 56 v. Mayo Clinic Health System-Eau Claire Clinic, Inc.*, 2016 WI 48, ¶6, 369 Wis. 2d 351, 880 N.W.2d 681, both of which confirmed the "physical injurious change" rule for the time of accrual of medical malpractice actions.  The court found that the Brellenthins' lawsuit was untimely and granted summary judgment in favor of Goblirsch.  The Brellenthins now appeal.

## DISCUSSION

¶14    We independently review a grant of summary judgment, using the same methodology as the circuit court.  *Hardy v. Hoefferle*, 2007 WI App 264, ¶6, 306 Wis. 2d 513, 743 N.W.2d 843.  Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. WIS. STAT. § 802.08(2). Here, the circuit court's summary judgment ruling turned on questions of statutory interpretation and application, which we also review independently. *See McNeil v. Hansen*, 2007 WI 56, ¶7, 300 Wis. 2d 358, 731 N.W.2d 273.

¶15 The parties agree that the summary judgment methodology under WIS. STAT. § 802.08(2) requires the moving party to put forth a prima facie case for summary judgment. To make a prima facie case for summary judgment, a moving defendant must show a defense that would defeat the plaintiff. *See Tews v. NHI, LLC*, 2010 WI 137, ¶4, 330 Wis. 2d 389, 793 N.W.2d 860. A prima facie case is established only when evidentiary facts are stated which, if they remain uncontradicted by the opposing party's affidavits, resolve all factual issues in the moving party's favor. *Walter Kassuba, Inc. v. Bauch*, 38 Wis. 2d 648, 655, 158 N.W.2d 387 (1968). If such a showing has been made, the court must examine the affidavits and other proof of the opposing party to determine whether a genuine issue exists as to any material fact or whether reasonable conflicting inferences may be drawn from undisputed facts. *Tews*, 330 Wis. 2d 389, ¶4.

¶16 The Brellenthins contend that Kelly suffered injuries as a result of Goblirsch's negligence. As relevant to our analysis, the statute of limitations for medical malpractice actions under WIS. STAT. § 893.55(1m) provides that:

> Except as provided by subs. (2) and (3), an action to recover damages for injury arising from any treatment or operation performed by, or from any omission by, a person who is a health care provider, regardless of the theory on which the action is based, shall be commenced within the later of:
>
> (a) Three years from the date of the injury, or

> (b) One year from the date the injury was discovered or, in the exercise of reasonable diligence should have been discovered, except that an action may not be commenced under this paragraph more than 5 years from the date of the act or omission.

Sec. 893.55(1m).[2]  The Brellenthins contend that Kelly's injuries did not occur until November 4, 2015, and their lawsuit was therefore timely filed on November 2, 2018, under § 893.55(1m)(a).  Accordingly, the timeliness of the Brellenthins' action hinges on when Kelly's alleged injuries due to corticosteroid toxicity occurred and whether this action was commenced within three years of that date.

¶17    Wisconsin case law has over time developed a consistent test for determining the date of injury in medical malpractice claims, which is the date of the "physical injurious change."  *Doe 56*, 369 Wis. 2d 351, ¶17.  The "physical injurious change" test has "withstood the test of time," and it has been applied to determine the expiration of the statute of limitations "in a variety of factual scenarios."  *Id.*

¶18    In order to constitute a "physical injurious change," an injury does not need to be untreatable.  *Genrich*, 318 Wis. 2d 553, ¶16.  Rather, an "actionable injury arises when the [negligent act or omission] causes a greater harm than [that which] existed at the time of the [negligent act or omission]."  *Paul v. Skemp*, 2001 WI 42, ¶25, 242 Wis. 2d 507, 625 N.W.2d 860.  Moreover, a later injury from the same tortious act does not restart the running of the statute of limitations. *Fojut v. Stafl,* 212 Wis. 2d 827, 832, 569 N.W.2d 737 (Ct. App. 1997).

---

[2]  There is no argument in this case that either WIS. STAT. § 893.55 (1m)(2) or (3) applies.

¶19     The Brellenthins agree that Goblirsch provided medical records pursuant to affidavit in support of his summary judgment motion and the Brellenthins do not contest the accuracy or content of any of those medical records.   They argue, however, that the medical records were insufficient to support a prima facie case for summary judgment.   In particular, they argue that expert testimony was required to prove whether Kelly suffered a physical injurious change as a result of Goblirsch's alleged negligent prescription of corticosteroids, or whether changes to her condition were merely ordinary and natural responses to the medication she was taking.   The Brellenthins also argue expert testimony was necessary to establish when any physical injurious change caused by Goblirsch's alleged negligence occurred.   Without such testimony, the Brellenthins contend there was a material question of fact "concerning whether Ms. Brellenthin had 'physical injurious changes,' and, if so, the nature of those, and ultimately the cause of those changes …."

¶20     The Brellenthins emphasize that this case involves the effects of a prescription drug taken over a period of time, that some of those effects were or could have been normal side effects of the drug, and that some of the effects may have abated while others did not.   Under these circumstances, the Brellenthins argue that Kelly's medical records alone cannot prove when she first suffered a physical injurious change as a result of Goblirsch's alleged overprescription of the corticosteroids.   While there is evidence in the record that Kelly experienced negative side effects from the corticosteroids more than three years before this action was commenced, including the effects claimed in her complaint, the Brellenthins contend a reasonable inference from the medical records could be that those adverse effects did not arise from Goblirsch's actions, but rather were merely natural side effects of taking steroids.   The Brellenthins therefore assert

9

that expert testimony was necessary to establish when any physical injury caused by Goblirsch's alleged negligence took place.

¶21 The Brellenthins' arguments fail for several reasons. First, the Brellenthins argue, without citation to any authority, that Goblirsch's medical records submission would be insufficient evidence for Goblirsch to prevail at trial and, therefore, it "should not pass muster at this stage of the proceedings."

¶22 Here, the Brellenthins incorrectly apply summary judgment procedure and conflate the need for expert testimony at trial with the need for expert testimony on summary judgment, where Goblirsch was only required to establish a prima facie case. To pursue summary judgment, Goblirsch was not required to submit the same proof that would have been required at trial, but only to make a prima facie case. As explained above, a prima facie case is characterized as one established … when evidentiary facts are stated which, if they remain uncontradicted by the opposing party's affidavits, resolve all factual issues in the moving party's favor. *Kassuba*, 38 Wis. 2d at 655. Once a claimant brings forward evidence sufficient to establish a prima facie case, the burden is on the opponent to produce sufficient evidence to go forward with its case. *See Tews*, 330 Wis. 2d 389, ¶4.

¶23 The medical records submitted in support of Goblirsch's summary judgment motion were sufficient to support a prima facie case for summary judgment.[3] As mentioned, the Brellenthins do not contest the accuracy or content

---

[3] The Brellenthins also make the argument that the medical records at issue are hearsay. Medical records fall under a well-known exception to the hearsay rule. *See* WIS. STAT. § 908.03(6m).

of any of those medical records. They acknowledge that the injuries Kelly sustained from Goblirsch's alleged negligent prescription of high doses of corticosteroids were avascular necrosis of her hips bilaterally and vestibular dysfunction resulting in migraine headaches. The medical records unequivocally show that Goblirsch prescribed corticosteroids to Kelly from March 4 through May 11, 2015. During and after that time, and before November 4, 2015, the records show that Kelly experienced multiple negative side effects—i.e., "physical injurious changes"—related to the corticosteroid use. These effects include the diagnosis of "[a]vascular necrosis of the femoral heads, left greater [than] the right, without evidence of articular surface collapse …" on October 28, 2015, and symptoms of vestibular dysfunction on October 6, 2015. These are the very injuries that the Brellenthins claim were caused by Goblirsch's alleged negligent prescription of high doses of corticosteroids and the resulting steroid toxicity.

¶24    The burden then shifted to the Brellenthins to overcome Goblirsch's prima facie showing. The Brellenthins, however, failed to provide an expert opinion or any counter affidavit that the mismanagement of Kelly's corticosteroids was not the cause of any physical injurious change to her—that is, avascular necrosis and migraine headaches—prior to November 4, 2015. In fact, the Brellenthins failed to put forth any proof to contradict the facts in the medical records demonstrating that Kelly experienced multiple negative side effects related to the corticosteroid use prior to November 4, 2015, and that those side effects were due to mismanagement of Kelly's corticosteroids. The Brellenthins present no disputed issue of material fact, nor do they raise an alternative inference from uncontroverted evidence entitling Kelly to a trial. We therefore reject the Brellenthins' argument.

11

¶25    While the Brellenthins assert we could reasonably infer that some of the negative effects Kelly suffered were the natural result of taking corticosteroids, they provide no evidence to support that assertion, either in the form of opposing expert opinion or via medical records.  As the circuit court correctly observed when reviewing the medical records, Kelly experienced the very adverse medical conditions that she claims resulted from Goblirsch's alleged negligence prior to November 4, 2015.  There is nothing in the appeal to permit a reasonable inference that Kelly's conditions, or other physically injurious conditions she experienced prior to November 4, 2015, were from another cause, including side effects that could reasonably be expected to accompany the use of corticosteroids.

¶26    Goblirsch provided admissible evidence to make a prima facie showing that the Brellenthins' claim was untimely.  As set forth above, Kelly's medical records submitted in support of Goblirsch's summary judgment motion contain numerous examples of physical injurious changes that she experienced more than three years before the Brellenthins filed suit.  In response to Goblirsch's motion, the Brellenthins did not submit evidence, in the form of affidavits or otherwise, to create a disputed issue of material fact as to whether Kelly experienced a physical injurious change more than three years before this lawsuit was filed.  Thus, even if we do not know precisely when Kelly first experienced a physical injurious change sufficient to cause her claim to accrue, we do know that she experienced the medical issues that she claims arose from Goblirsch's alleged negligence by at least July 8, 2015, for the headaches, and by October 28, 2015, for the avascular necrosis.  Both of those dates occurred more than three years prior to the commencement of the Brellenthins' lawsuit.

¶27    The Brellenthins offered nothing from the medical records to rebut the above facts.  There is nothing in the records to indicate that all of the adverse

reactions Kelly had to the corticosteroids prior to November 4, 2015, were unrelated to Goblirsch's alleged negligence, while at the same time his alleged negligence would have caused those exact same negative physical responses after November 4, 2015. In fact, the record shows that Goblirsch had stopped treating Kelly by June 3, 2015.

¶28 Ultimately, the undisputed facts establish that Kelly suffered a physical injurious change as a result of Goblirsch's alleged negligence no later than October 28, 2015. The Brellenthins did not file the instant lawsuit until November 2, 2018—more than three years after that date. Accordingly, the Brellenthins' claims are time barred under WIS. STAT. § 893.55(1m)(a), and the circuit court properly granted Goblirsch summary judgment.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.